IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

KENNETH WALLOR,                    )
                                   )
v.                                 )      No. 2:06-0080
                                   )
MICHAEL J. ASTRUE,                 )
Commissioner of Social Security[1] )


To: The Honorable John T. Nixon, Senior District Judge


## REPORT AND RECOMMENDATION

The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Secretary of Health and Human Services denying Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act").

Upon review of the Administrative Record as a whole, the Court finds that the Commissioner's determination that the plaintiff could perform his past relevant work as a concrete truck driver during the relevant time period is supported by substantial evidence in the record as required by 42 U.S.C. § 405(g), and that the plaintiff's motion for judgment on the record (Docket Entry No. 16) should be denied.


## I. INTRODUCTION

The plaintiff filed an application for DIB on March 5, 2004,[2] alleging disability due to "knee pain, carpal tunnel, shingles in the eye, heat exaustion [sic], off balance most of the time, high blood

_____

[1] Michael J. Astrue is automatically substituted for his predecessor Jo Anne Barnhart as Commissioner of Social Security pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

[2] There is a discrepancy as to when the plaintiff initially filed for disability benefits. The hearing transcript and disability determination form indicate that the plaintiff filed on March 5, 2004 (Tr. 26, 54), but the plaintiff's application for disability is dated February 5, 2004. (Tr. 70.)

pressure, high cholesterol, depression, [and] hearing" with a date of onset on April 1, 1999. (Tr. 70, 76.)  The plaintiff's claim was denied initially and upon reconsideration. (Tr. 56-58, 60-61.)  On February 2, 2006, the plaintiff amended his alleged onset date to August 20, 2002. (Tr. 26, 138.) A hearing was held before Administrative Law Judge ("ALJ") Jack Williams on February 7, 2006. (Tr. 24- 51.)  The ALJ delivered an unfavorable decision on May 24, 2006 (Tr. 11-16), and the plaintiff petitioned for a review of that decision before the Appeals Council. (Tr. 7.) The Appeals Council denied the plaintiff's request for review of that decision on August 3, 2006 (Tr. 4-6), and the ALJ's decision became the final decision of the Commissioner.

## II. BACKGROUND

The plaintiff was born on January 8, 1943, and was 59 years old on August 20, 2002, his alleged onset date. (Tr. 70, 138.)  The plaintiff completed high school and two years of college. (Tr. 28, 84.)  The plaintiff's past job was as a Ready Mix concrete truck driver for nearly 30 years. (Tr. 28, 78.)

### A. Chronological Background: Procedural Developments and Medical Records

The plaintiff stopped working in 1999 due to chronic knee trouble, back problems, and carpal tunnel syndrome. (Tr. 28-29.)  After two months of physical therapy, the plaintiff attempted to return to work, but he testified that he "physically could not do it anymore." (Tr. 29.)

The plaintiff presented to Dr. Chris Sewell on July 27, 2000, at which time he related having "some trouble with his blood pressure." (Tr. 220.) Dr. Sewell's assessment was unremarkable and he prescribed medication to control the plaintiff's high blood pressure. *Id.*  The plaintiff's blood pressure showed improvement during his next two visits to Dr. Sewell. (Tr. 218-19.)   On November 22, 2000, the plaintiff returned to Dr. Sewell complaining of shingles on his face and

2

eyes. (Tr. 218.)  Dr. Sewell recommended that the plaintiff continue taking Zovirax[3] and return in one week for a follow up visit. *Id.*  The plaintiff returned to Dr. Sewell on March 8, 2001, and March 16, 2001, with complaints of a rash on his arms, face, and chest. (Tr. 217.)  Dr. Sewell attributed the rash to poison ivy or poison oak. *Id.*  On August 15, 2001, the plaintiff presented to Dr. Sewell after being hospitalized for heat exhaustion and he was advised to stay indoors and drink plenty of fluids. (Tr. 140, 216.)  The plaintiff visited Dr. Sewell on October 25, 2001, for medication refills. (Tr. 214.)  Dr. Sewell treated the plaintiff for bronchitis, pneumonia, cough, and sinusitis in March, April, May, and June of 2002.[4]  (Tr. 208-13.)

The plaintiff amended his onset date to August 20, 2002, because that is when Dr. Sewell first prescribed Paxil, an anti-depressant, for his "severe anxiety disorders."[5]  (Tr. 138, 207.)  Therefore, the relevant time period during which the plaintiff may claim DIB extends from August 20, 2002, his amended alleged onset date, to December 31, 2004, his date last insured. (Tr. 67.)

When the plaintiff returned to Dr. Sewell on November 18, 2002, he related that the Paxil was helping his mood, but that he still "gets short" at times. (Tr. 205.)  The plaintiff had "no other real problems" and no side effects from the medications. *Id.*  Dr. Sewell diagnosed the plaintiff with anxiety and noted that he had been evaluated by Dr. Bise for "[d]ecreased hearing acuity with high frequency hearing loss." *Id.*  On December 20, 2002, the plaintiff presented to Dr. Sewell with complaints of arm pain and numbness after lifting hay bales. (Tr. 204.)  Dr. Sewell diagnosed the

---

[3] Zovirax is a drug used in the treatment of certain infections associated with the herpes virus, including shingles. Physicians' Desk Reference 1690-91 (63rd ed. 2009) ("PDR").

[4] On April 30, 2002, Dr. James Stallworth x-rayed the plaintiff's chest and found "focal pneumonia involving the lingula." (Tr. 237.) Two weeks later, chest x-rays performed by Dr. Keith Kimbrell revealed "minimal residual pneumonia" and "[p]ossible bronchitis." (Tr. 158-59, 233-34.)

[5] Paxil is a drug used in the treatment of major depressive disorder, social anxiety disorder, obsessive compulsive disorder, panic disorder, generalized anxiety disorder, and post-traumatic stress disorder. PDR at 1525.

plaintiff with "carpal tunnel bilaterally" and placed him in wrist splints. *Id.* Dr. Sewell's treatment notes indicated that the plaintiff was still taking Paxil for anxiety. *Id.*

The plaintiff returned to Dr. Sewell for follow-up visits in January, February, and April of 2003, and he reported that his carpal tunnel syndrome was improving.[6] (Tr. 201-03.) Dr. Sewell continued to prescribe Paxil for the plaintiff's anxiety. *Id.* On August 20, 2003, the plaintiff related that he was "doing pretty well" and that the Paxil had stabilized his mood, but that he still had outbursts. (Tr. 200.) On January 5, 2004, the plaintiff presented to Dr. Sewell with complaints "of sore throat, some cough, feeling tired at times, and head cold." (Tr. 199.) Dr. Sewell noted that the plaintiff was having "forgetfulness and mood swings," and he referred the plaintiff to Dr. Thuy Ngo for evaluation. *Id.*

Dr. Ngo examined the plaintiff on February 3, 2004, for memory loss. (Tr. 164-65.) A detailed neurologic exam of the plaintiff revealed "no significant evidence of memory impairment" and Dr. Ngo opined that anxiety was the cause of most of his "memory loss symptom[s]." (Tr. 165.) Dr. Ngo also suggested that the plaintiff had "a contributing vascular dementia that is mild." *Id.* Dr. Ngo recommended increasing the plaintiff's daily amount of Paxil and indicated that he would see the plaintiff "on a p.r.n. [as needed] basis." *Id.* On May 1, 2004, Dr. Ngo provided the Disability Determination Section of the Tennessee Department of Human Services with additional information pertaining to the plaintiff's mental diagnoses. (Tr. 162-63.) Dr. Ngo determined that the plaintiff did not have "an underlying mental disorder that significantly interfere[d] with functioning," or show any signs of mental retardation.(Tr. 162.) Dr. Ngo also noted that medication was not prescribed for a mental disorder[7] nor did he refer the plaintiff for mental health treatment, and he opined that the plaintiff's diagnosis was not "related to a physical condition." *Id.*

---

[6] The plaintiff was screened for Dysuria on January 6, 2003. (Tr. 147-50.) Dysuria causes "painful or difficult urination." Dorland's Illustrated Medical Dictionary 522 (27th ed. 1988).

[7] That notation is peculiar since Dr. Ngo knew that the plaintiff was prescribed Paxil and, in fact, Dr. Ngo had recommended three months earlier that his dosage of Paxil be increased.

4

The plaintiff returned to Dr. Sewell on April 29, 2004, after suffering a sprained ankle when a "horse stepped on his foot."[8] (Tr. 198.) The plaintiff also complained of skin irritation on his feet, for which Dr. Sewell prescribed Lotrisone cream. *Id.* During a follow-up visit on June 15, 2004, the plaintiff reported that his sprained foot was "doing a lot better," the Lotrisone cream had helped his skin irritation, his mood was improved, and his carpal tunnel was fairly stable. (Tr. 197A.)

Upon referral by the Tennessee Disability Determination Services ("DDS"), consultative psychologist Dr. Linda Blazina examined the plaintiff on June 10, 2004, and she opined that his ability to understand, remember, and adapt was not "significantly limited;" his ability to concentrate and persist was not limited; and that his "social interaction abilities [were] not noticeably limited." (Tr. 170) Dr. Blazina assigned the plaintiff a Global Assessment of Functioning ("GAF") score of 85 to 95.[9] The plaintiff "denied any current feelings of noticeable anxiety or depression," but he did reveal feeling depressed or anxious in the past. (Tr. 169.) The plaintiff also reported that he is able to drive with no difficulty, shop, do household chores and use his riding lawn mower, prepare food, attend church regularly, visit with others, and feed, brush, and ride his horses. (Tr. 168.)

Dr. Michael T. Cox, a DDS consultative physician, conducted a physical examination of the plaintiff on June 23, 2004 (Tr. 172-76), and found that he "appeared to be in no acute medical distress;" could walk across the examination room and climb up onto the examination table "without difficulty;" and "[h]is ability to hear, speak, and communicate" was not impaired. (Tr. 173.) Dr. Cox also gave the plaintiff a neurological exam and indicated that the strength in his four extremities

---

[8] Dr. Thomas Hall, a radiologist, x-rayed the plaintiff's foot and found "no specific abnormalities." (Tr. 222.)

[9] A GAF of 81-90 falls within the range of "[a]bsent or minimal symptoms, good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, and no more than everyday problems or concerns. Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000) ("DSM-IV-TR"). A GAF of 91-100 falls within the range of "[s]uperior functioning in a wide range of activities, life's problems never seem to get out of hand, is sought out by others because of his/her many positive qualities[,and] [n]o symptoms." *Id.*

"was intact," that he could stand on his toes and heels, that he could balance himself on either foot, and that the range of motion in all of his joints "was unremarkable." *Id.* Dr. Cox concluded that in an eight hour workday the plaintiff could lift up to ten pounds occasionally and five pounds frequently, sit eight hours with a break period about every hour, and stand four hours. (Tr. 175.) Dr. Cox opined that the plaintiff could "get up and move around every three minutes or so," and that "[h]e should avoid squatting, bending, kneeling, stooping and climbing for more than a total of four hours in an eight-hour workday altogether." *Id.* Dr. Cox also noted that the plaintiff's "ability to hear, speak, and communicate" were not impaired. *Id.*

On July 7, 2004, Dr. Suzanne M. Fletcher, a DDS consultant, completed a Residual Functional Capacity ("RFC") form. (Tr. 190-95.) She diagnosed the plaintiff with hypertension and herpes zoster. (Tr. 190.) Dr. Fletcher indicated that the plaintiff could lift/carry up to fifty pounds occasionally and up to twenty-five pounds frequently. (Tr. 191.) She opined that the plaintiff could stand/walk and sit about six hours in an eight hour workday, and that pushing and pulling was unlimited. *Id.* Dr. Fletcher also noted that the limitations Dr. Cox assigned to the plaintiff were "too restrictive as per exam" and that the plaintiff did not demonstrate any neurological deficits. (Tr. 194.)

On October 18, 2004, the plaintiff returned to Dr. Sewell to discuss adjusting his medications since "he [was] getting really anxious at times." (Tr. 286.) Dr. Sewell prescribed Wellbutrin[10] for the plaintiff and referred him to Dr. Joyce Crouch, a psychologist, for depression and anxiety. *Id.* The plaintiff complained of having difficulty transitioning to Wellbutrin at his next appointment on November 5, 2004, but Dr. Sewell continued to prescribe it. (Tr. 285.) Dr. Sewell also prescribed

---

[10] Wellbutrin is an antidepressant used in the treatment of major depressive disorder. PDR at 1648-49.

6

Xanax[11] for the plaintiff's intermittent explosive disorder.[12]   On November 22, 2004, the plaintiff

reported that he was "doing pretty well," that the Wellbutrin and Xanax were both helping, and that

he did not "feel as anxious." (Tr. 284.)  Dr. Sewell renewed his prescriptions for both Wellbutrin

and Xanax. *Id.*  The plaintiff returned to Dr. Sewell on January 6, 2005, and reported that he was

"doing pretty well" and his medicine was helping, but that his mood was still troubled at times. (Tr.

283.)  Dr. Sewell diagnosed the plaintiff with a sinus infection and prescribed a Z-pack and Flonase

nasal spray. *Id.*  On February 1, 2005, the plaintiff presented to Dr. Sewell and complained that his

sinusitis had not improved. (Tr. 282.)   Dr. Sewell re-filled his prescription for Flonase and

prescribed Ceclor. *Id.*

    The plaintiff's sinusitis cleared by March 14, 2005, and he reported that his "mood [was]

stable" and that he was "doing pretty well." (Tr. 281.)  Dr. Sewell's overall assessment of the

plaintiff remained unchanged and he renewed the plaintiff's Wellbutrin prescription. *Id.*   The

plaintiff returned to Dr. Sewell on May 2, 2005, and he revealed that "he [had] been off Wellbutrin

now for a bit" and that he would like to try Zoloft.[13] (Tr. 280.)  Dr. Sewell complied with that

request and prescribed Zoloft instead of Wellbutrin. *Id.*   Treatment notes from May 26, 2005,

indicate that the plaintiff was "doing really well" on Zoloft and that his mood had improved. (Tr.

279.)  The plaintiff returned to Dr. Sewell for follow-up visits in July, August, and November of

2005, and he continued to report that he was "doing pretty well." (Tr. 276-78.)  Dr. Sewell continued

---

[11] According to WebMD, Xanax is used to treat anxiety and panic disorders.

[12] According to MayoClinic.com, intermittent explosive disorder "is characterized by repeated episodes of aggressive, violent behavior in which you react grossly out of proportion to the situation."

[13] According to Drugs.com, Zoloft is an antidepressant "used to treat depression, obsessive-compulsive disorder, panic disorder, anxiety disorders, post-traumatic stress disorder (PTSD), and premenstrual dysphoric disorder (PMDD)."

7

to diagnose the plaintiff with intermittent explosive disorder, depression, and anxiety, and he renewed his prescription for Zoloft. *Id.*

Beginning on October 24, 2004, Dr. Crouch met with the plaintiff for a series of therapy sessions focused on the plaintiff's anxiety, anger management problems, and family issues. (Tr. 266-72.) Dr. Crouch's treatment notes from April 20, 2005, indicate that the plaintiff reported that "he thinks he is not becoming irritated as much as he did before therapy began." (Tr. 270.) On May 25, 2005, the plaintiff reported that he was talking Zoloft, and that he was "less easily angered" and "keeps his emotions under better control." (Tr. 271.) At the June 29, 2005, therapy session, the plaintiff's anxiety was heightened after being notified that he might lose his TennCare coverage. (Tr. 271.) Although Dr. Crouch indicated that the plaintiff was "channeling his frustrations better," she found that he was "still rationalizing when he [met] a frustrating situation." *Id.* The plaintiff's last appointment of record with Dr. Crouch was on July 20, 2005. (Tr. 272.)

Dr. Sewell completed a Medical Assessment of Ability to do Work-Related Activities ("Medical Assessment") on February 2, 2006. (Tr. 273-75.) He opined that the plaintiff could lift/carry less than ten pounds both occasionally and frequently in an eight hour day, and that he could stand/walk for two hours, without interruption, in an eight hour day. (Tr. 273.) Dr. Sewell indicated that the plaintiff's diagnoses of osteoarthritis, intermittent explosive disorder, hyperlipidemia, hypertension, and gout supported his findings. *Id.* He opined that the plaintiff could sit for two hours, without interruption, in an eight hour day. (Tr. 274.) Dr. Sewell limited all postural activities to "occasionally," including climbing, balancing, kneeling, crouching, crawling, and stooping. *Id.* He indicated that reaching, handling, feeling, push/pulling, seeing, hearing, and speaking were affected by the plaintiff's osteoarthritis. *Id.* All environmental limitations, including heights, moving machinery, temperature extremes, chemicals, dust, noise, vibration, humidity, and fumes were limited. (Tr. 275.) Dr. Sewell concluded that the plaintiff's limitations in range of

motion and physical activity were due to osteoarthritis, obesity, hypertension, hyperlipidemia, and intermittent explosive disorder.[14] *Id.*

## B. Hearing Testimony: The Plaintiff and a Vocational Expert

The plaintiff's hearing in this case was held on February 7, 2006, before ALJ Jack Williams. (Tr. 26-51.)  The plaintiff was represented by an attorney, and the plaintiff and a Vocational Expert ("VE") testified at the hearing. *Id.*

The plaintiff testified that he worked for "30-plus years as a concrete driver" and that he became unable to work in 1999. (Tr. 28.)  He explained that knee and back problems, and carpal tunnel syndrome inhibited his ability to physically perform his job. (Tr. 28-29.)  In September of 2002, the plaintiff reported that he was diagnosed with severe anxiety disorder and was prescribed Paxil. (Tr. 29.)  The plaintiff testified that he does not mow his own grass, that his daughter pays his bills, that he becomes frustrated easily and has crying episodes, and that he has worn wrist splints since December of 2002. (Tr. 30-32.)  The plaintiff also testified that he has "gouty arthritis," intermittent sciatic nerve pain, herpes zoster, and shingles. (Tr. 33-34.)

The plaintiff testified that he tried numerous medications for his intermittent explosive disorder and that his current Zoloft prescription "seems to have helped." (Tr. 34.)  The plaintiff explained that he suffers from fifteen to eighteen intermittent explosive disorder episodes per month. (Tr. 35.)  He related that he "drop[s] things" on a regular basis with his right hand, suffers from hearing loss in both ears, and is not able to use a riding law mower because the vibration bothers his hands and knees. (Tr. 36-38.)  The plaintiff testified that he has difficulty vacuuming, but that he is able to feed his horses, drive a car, and dust around his house. (Tr. 38-39.)  He also reported that he

---

[14] Every attempt to decipher Dr. Sewell's support for his findings was undertaken; however, several handwritten sections were simply illegible.

stopped attending his psychological counseling sessions a few months before the hearing because some of his problems "[had] gotten a little better." (Tr. 39.)

Joann Bullard, the VE, testified that the plaintiff's past relevant work included concrete mixing truck driver at the medium, semi-skilled level, and material handler at the heavy, semi-skilled level. (Tr. 44.) The ALJ asked the VE to consider a sixty-one year old person with a high school education who is close to retirement with the plaintiff's background and experience, arthritis, occasional knee pain, carpal tunnel syndrome, high blood pressure, high frequency hearing loss, and shingles. *Id.* The ALJ specified that the VE should also assume that the hypothetical person is "limited to medium exertion" and able to communicate with others, has some anxiety and depression that would restrict his interaction with others, and is not able to work where "excellent hearing is an essential component of the job." (Tr. 44-45.) The VE opined that a person with these limitations could work as a concrete mixing truck driver, the past relevant work of the plaintiff, and as a machine cleaner, hand packager, or industrial cleaner. (Tr. 45.)

### III. THE ALJ's FINDINGS

The ALJ issued an unfavorable decision on May 24, 2006. (Tr. 11-16.) Based on the record, the ALJ made the following findings:

1.      The claimant met the insured status requirements of the Social Security Act only through December 31, 2004.

2.      The claimant has not engaged in substantial gainful activity at any time relevant to this decision (20 CFR 404.1520(b) and 404.1571 *et seq*.).

* * *

3.      The claimant has the following severe impairments: arthritis, including gouty arthritis; knee pain; carpal tunnel syndrome; hypertension; some hearing loss; and right eye shingles.

* * *

10

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

* * *

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work. Although he can communicate satisfactorily, he requires work where excellent hearing is not an essential component of the job. Due to some anxiety and depression with increased irritation at times, he should avoid close interaction with others as opposed to superficial interaction. The claimant's physical capacity limitations are consistent with the June 2004 State Agency physician's medical source statement and September 2004 analysis (Exhibits 7F and 10F). While Dr. Cox and Dr. Sewell both limited the claimant to less than sedentary exertion, the undersigned Administrative Law Judge finds that he is unable to accept their very conservative RFC estimates (Exhibits 5F and 13F). It is obvious that they based their opinions almost entirely on the claimant's subjective complaints, and the undersigned finds that such restrictions are not supported by the objective medical evidence of record. The claimant's mental capacity limitations are considered more than reasonable in light of the fact that the consultative psychologist and the State agency psychologist found no mental limitations (Exhibits 4F and 6F).

6.      The claimant is capable of performing past relevant work as a concrete truck driver which is medium and semi-skilled work. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

* * *

7.      The claimant has not been under a "disability," as defined in the Social Security Act, from April 1, 1999 through the date last insured, December 31, 2004 (20 CFR 404.1520(f)).

(Tr. 13-16.)

# IV. DISCUSSION

## A. Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching his conclusion. 42 U.S.C.A. § 405(g). *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social Security cases). The Commissioner's decision must be affirmed if it is supported by substantial evidence, even if the evidence could also support another conclusion. *Her v. Comm'r of Soc. Sec.,* 203 F.3d 388, 389-90 (6th Cir. 1999). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*). A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to support the ALJ's determination. 42 U.S.C.A. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d).

12

First, the plaintiff must show that he is not engaged in "substantial gainful activity" at the time he seeks disability benefits. *Id.* (citing 20 C.F.R. §§ 404.1520(b) and 416.920(b)). A plaintiff who is performing substantial gainful activity is not disabled no matter how severe the plaintiff's medical condition may be. *See, e.g., Dinkel v. Sec'y of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

Second, the plaintiff must show that he suffers from a "severe impairment." A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.* (citing 20 C.F.R. §§ 404.1520(c) and 416.920(c)). Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b). The Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C. § 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the plaintiff is presumed disabled without further inquiry, regardless of age, education or work experience. *Id.* (citing 20 C.F.R. §§ 404.1520(d) and 416.920(d)). The plaintiff may establish that he meets or equals a listed impairment, and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

13

Fourth, if the plaintiff's impairment does not prevent him from doing his past relevant work, he is not disabled. *Id.* The plaintiff has the burden of proving inability to perform past relevant work, or proving that a particular past job should not be considered relevant. *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, he must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that he is unable to perform his prior relevant employment, the burden shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment, and that such employment exists in the national economy. *See, e.g., Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). To rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs a plaintiff can perform. *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S. Ct. 2428, 77 L.Ed.2d 1315 (1983) (upholding the validity of the medical-vocational guidelines "grid" as a means for the Commissioner of carrying his burden under appropriate circumstances). It remains the plaintiff's burden to prove the extent of his functional limitations. *Her*, 203 F.3d at 391. Even if the plaintiff's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the plaintiff can perform, he is not disabled.[15] *Id. See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

---

[15] This latter factor is considered regardless of whether such work exists in the immediate area in which the plaintiff lives or whether a specific job vacancy exists or whether the plaintiff would be hired if she applied. *Ragan v. Finch*, 435 F.2d 239, 241 (6th Cir. 1970).

14

## B. The Five-Step Inquiry

In this case, the ALJ resolved the plaintiff's case at step four of the five-step inquiry, and ultimately concluded that he was not under a disability as defined by the Act. (Tr. 16.) At step one, the ALJ found that the plaintiff had not engaged in substantial gainful activity since August 20, 2002, the alleged onset date of disability. (Tr. 13.) At step two, the ALJ found that the plaintiff suffered from the severe impairments of arthritis, including gouty arthritis; knee pain; carpal tunnel syndrome; hypertension; some hearing loss; and right eye shingles. *Id.* At step three, the ALJ determined that the plaintiff's impairments did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. *Id.* At step four, the ALJ found that the plaintiff was capable of performing past relevant work as a concrete truck driver. (Tr. 16.)

The effect of this decision was to preclude the plaintiff from DIB benefits and to find him not disabled, as defined in the Social Security Act, at any time after August 20, 2002, through December 31, 2004, his date last insured.

## C. Plaintiff's assertions of error

The plaintiff alleges that the ALJ erred in disregarding the medical opinions of the plaintiff's treating physicians, Dr. Chris Sewell and Dr. Joyce G. Crouch, and consulting physician, Dr. Thuy Ngo. The plaintiff also contends that the ALJ did not properly evaluate his RFC and that the VE's testimony does not support the ALJ's finding that he could perform his past relevant work.

### 1. The ALJ properly assessed the medical evidence of the plaintiff's treating and consulting physicians.

The plaintiff argues that the ALJ erred in rejecting the medical opinions of treating physicians Dr. Sewell and Dr. Crouch, and consulting physician Dr. Ngo. (Docket Entry No. 16 at 1-2.) Dr. Sewell first examined the plaintiff on July 27, 2000, for "trouble with his high blood pressure." (Tr. 220.) He examined the plaintiff nearly every other month over a five year period.

15

(Tr. 197-220, 276-86.) Dr. Crouch first examined the plaintiff on October 25, 2004 (Tr.266), and over a nine month period, saw the plaintiff nearly three times per month. (Tr. 266-72.) Given the regularity that Dr. Sewell and Dr. Crouch saw the plaintiff, both should be classified as treating sources under 20 C.F.R. § 404.1502.[16] Dr. Ngo examined the plaintiff once, on February 3, 2004, on referral from Dr. Sewell. Due to Dr. Ngo's single examination of the plaintiff, he should be classified as a nontreating source.[17]

Treating physicians are "the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from objective medical findings alone." 20 C.F.R. § 416.927(d)(2). Generally, an ALJ is required to give "controlling weight" to the medical opinion of a treating physician, as compared to the medical opinion of a non-treating physician, if the opinion of the treating source is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). This is commonly known as the treating

---

[16] A treating source, defined by 20 C.F.R. § 404.1502, is
> your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s).

[17] A nontreating source, defined by 20 C.F.R. § 404.1502, is
> a physician, psychologist, or other acceptable medical source who has examined you but does not have, or did not have, an ongoing treatment relationship with you. The term includes an acceptable medical source who is a consultative examiner for us, when the consultative examiner is not your treating source.

16

physician rule. *See* Soc. Sec. Rul. 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir.2004).

However, the functional limitations assigned by Dr. Sewell were not supported by clinical or laboratory testing and were inconsistent with the evidence in the record. When the plaintiff presented to Dr. Sewell for a physical examination on August 20, 2002, his alleged onset date, Dr. Sewell's treatment notes reflected no abnormal physical findings. (Tr. 207.) Dr. Sewell examined the plaintiff again in September and November of 2002 and his diagnoses remained unremarkable. (Tr. 205-06.) Although Dr. Sewell had treated the plaintiff for high blood pressure, shingles, skin rash, heat exhaustion, bronchitis, pneumonia, and sinusitis before August 20, 2002, his first complaint of a physical ailment after his alleged onset date was on December 20, 2002, when Dr. Sewell diagnosed him with "carpal tunnel bilaterally." (Tr. 204.) Treatment notes indicate that the plaintiff's carpal tunnel syndrome steadily improved over the next several months and that by June 13, 2004, it was "stable." (Tr. 197A.) Furthermore, the majority of the plaintiff's clinical and laboratory tests focus on screening for high levels of cholesterol, prostate cancer, and colon cancer. (Tr. 223-32, 288-92.) The plaintiff did have an x-ray of his right foot in April of 2004 after a horse stepped on it, but it revealed that his foot had "no specific abnormalities." (Tr. 222.)

Consultative DDS examiner Dr. Fletcher completed a RFC evaluation of the plaintiff on July 7, 2004, nearly six months before his date last insured, and found him to have no significant limitations. (Tr. 190-94.) Dr. Sewell, however, conducted his medical assessment of the plaintiff on February 2, 2006, nearly fourteen months after the plaintiff's date last insured. (Tr. 273-75.) Dr. Sewell's medical opinion did not deserve controlling weight since his findings were not supported by laboratory tests or substantial evidence in the record.

Even if a treating source's medical opinion is not given controlling weight, it is "'still entitled to deference and *must be weighed using all of the factors provided in 20 C.F.R. 404.1527*

17

. . . .'" *Fisk v. Astrue*, 253 Fed. Appx. 580, 585 (6th Cir. Nov. 9, 2007) (quoting Soc. Sec Rul. 96-2p, 1996 WL 374188, at *4) (emphasis in original). The ALJ must consider

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion with respect to relevant evidence such as medical signs and laboratory findings; (4) the consistency of the opinion with the record as a whole; (5) the specialization of the physician rendering the opinion; and (6) any other factor raised by the applicant.

*Meece v. Barnhart*, 192 Fed. Appx. 456, 461 (6th Cir. Aug. 8, 2006)(quoting 20 C.F.R. § 404.1527(d)(2)-(6)). The ALJ must also provide "good reasons" for the resulting weight given to the treating source. Soc. Sec Rul. 96-2p, 1996 WL 374188, at *5 (citing 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)). The "good reasons" must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.*

The ALJ focused on the factors of supportability and consistency in discounting Dr. Sewell's medical assessment of the plaintiff. The severe functional limitations Dr. Sewell assigned to the plaintiff were not consistent with either the evidence in the record or his own treatment notes. The ALJ stated:

> While Dr. Cox and Dr. Sewell both limited the claimant to less than sedentary exertion, the undersigned Administrative Law Judge finds that he is unable to accept their very conservative RFC estimates. It is obvious that they based their opinions almost entirely on the claimant's subjective complaints, and the undersigned finds that such restrictions are not supported by the objective medical evidence of record.

(Tr. 14.) (internal citations omitted) As previously discussed, the plaintiff had no complaints of physical pain during his first three visits to Dr. Sewell after his alleged onset date. (Tr. 205-07.) On December 20, 2002, four months after his alleged onset date, it was evident that the plaintiff was still engaged in physical activity when he reported "bilateral arm pain and numbness" due to lifting hay bales. (Tr. 204.) After taking anti-inflammatory medication and wearing wrist splints for almost two months, the plaintiff said that he felt "a lot better." (Tr. 202.) During the next eleven months

18

Dr. Sewell examined the plaintiff three times, his course of treatment for the plaintiff remained unchanged, and the plaintiff's carpal tunnel steadily improved. (Tr. 199-201.) By June 15, 2004, the plaintiff's carpal tunnel was "stable."[18] (Tr. 197A.)

Dr. Sewell also treated the plaintiff's complaints of anxiety and first prescribed Paxil for him on August 20, 2002. (Tr. 207.) On subsequent visits, in October of 2002 through June of 2004, the plaintiff reported that the Paxil "seems to be helping him" (Tr. 206); "seems to be helping his mood a little bit" (Tr. 205); stabilized his mood, but he "still has outbursts" (Tr. 200); and that his mood was stabilized and his anxiety reduced. (Tr. 197A) When the stabilizing effect of Paxil decreased in October 2004, Dr. Sewell "switched him over to Wellbutrin" for intermittent explosive disorder. (Tr. 286.) On November 5, 2004, the plaintiff reported that he had difficulty with transitioning to Wellbutrin (Tr. 285), but after nearly a month of taking the medication he reported that "the Wellbutrin seem[ed] to be helping some" and that he did not "feel as anxious." (Tr. 284.) The plaintiff reported having intermittent "trouble with his mood" at his January 6, 2005, visit to Dr. Sewell (Tr. 283), but two months later he stated that his "[m]ood is pretty stable." (Tr. 281.) Dr. Sewell switched the plaintiff to Zoloft on May 2, 2005 (Tr. 280), and at a follow-up examination the plaintiff "[s]aid he is doing really well with it" and that "his mood is improved." (Tr. 279.) Dr. Sewell's treatment notes for the plaintiff's last three visits do not show any additional fluctuations in his mood. (Tr. 273-75.)

Dr. Sewell's treatment notes indicate that both the plaintiff's physical and mental impairments followed a pattern of diagnosis, conservative treatment, and improvement. The plaintiff also revealed that he could lift bales of hay (Tr. 204), drive with no difficulty, shop, perform

---

[18] The plaintiff also suffered from right foot pain after a horse stepped on his foot, but x-rays indicated that his right foot showed "no specific abnormalities." (Tr. 198, 222.) On June 15, 2004, the plaintiff revealed that his right foot was "doing a lot better." (Tr. 197A)

household chores and use his riding lawn mower,[19] prepare food, attend church regularly, visit with others, and feed, brush, and ride his horses. (Tr. 168.) Dr. Sewell's prescribed treatment and treatment notes, and the plaintiff's daily activities do not support the functional restrictions in Dr. Sewell's medical assessment of the plaintiff. (Tr. 273-75.) The ALJ also provided "good reasons," as required by Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5 (citing 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2)), for assigning little weight to Dr. Sewell's assessment of the plaintiff. (Tr. 14.)

Although Dr. Crouch is a treating psychologist, the ALJ did not err in failing to specifically weigh Dr. Crouch's therapy notes because the therapy notes should not be classified as medical opinions. The ALJ stated

> [t]he claimant participated in mental health therapy with psychologist Dr. Crouch, Ed.D., during the period of October 2004 through July 2005, and the psychologist noted in August 2005 that he had failed to keep his last two scheduled appointments. He reported situational stressors of financial difficulties and family problems causing depression and anxiety and which he reported continued to cause him to become angry. He related that he frequently became angry with his daughter who overused his credit card; with his son in law who did not work; and with his wife who bought excessive amounts of cosmetics but who did not wish him to indulge in his hobby of collecting military patches.

(Tr. 15.) A medical opinion, as defined by 20 C.F.R. § 404.1527(a)(2), is a "statement[] from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis, and prognosis, what [he] can still do despite impairment(s), and [his] physical or mental restrictions." Dr. Crouch indicated that the plaintiff had been prescribed Paxil and Zoloft for anxiety and depression (Tr. 266, 271), but the majority of her therapy notes simply summarize his subjective complaints and the information he relayed to her. (Tr. 266-72.)

---

[19] The plaintiff told Dr. Blazina on June 10, 2004, that he was able to mow with a riding mower (Tr. 168), but he testified at the hearing before the ALJ that he was not able to use a riding lawn mower because the vibration bothered his hands and knees. (Tr. 38.)

20

While an ALJ must consider the factors in 20 C.F.R. § 404.1527(d)(2)-(6) in determining the amount of weight afforded to a treating physician's medical opinions and provide "good reasons" for that weight, the treating physician's medical notes must contain medical judgments and assessments of the plaintiff's conditions for the ALJ to review. The plaintiff points to the "multiple treatments by [Dr.] Crouch" as support for the plaintiff's alleged mental impairments. Docket Entry No. 16, at 2. Yet, it is difficult to discern with what Dr. Crouch diagnosed the plaintiff and what treatment plan she followed given that her therapy notes are devoid of the very professional opinions and judgments that would allow them to be categorized as medical opinions. (Tr. 266-72.) Thus, Dr. Crouch's therapy session notes are not medical opinions as defined by 20 C.F.R. § 404.1527(a)(2), and the ALJ did not err in failing to assign specific weight to those notes under 20 C.F.R. § 404.1527.

The ALJ also did not err in assessing the medical opinions of consulting physician Dr. Ngo. The ALJ stated that "[t]he claimant's mental capacity limitations [that he assigned] are considered more than reasonable in light of the fact that the consultative psychologist and the State agency psychologist found no mental limitations." (Tr. 14.) The plaintiff argues that this finding directly contradicted Dr. Ngo's medical evaluations. Docket Entry No. 16, at 2. Dr. Ngo initially reported that a detailed neurological exam of the plaintiff revealed "no significant evidence of memory impairment" and he attributed the plaintiff's memory loss symptoms to anxiety. (Tr. 165.) Dr. Ngo also suggested that the plaintiff had "a contributing vascular dementia that is mild" and recommended increasing his Paxil dosage. *Id.* Nearly two months later on March 31, 2004, Dr. Ngo reported that the plaintiff did not have "an underlying mental disorder that significantly interfere[d] with functioning," his mental diagnosis was not related to "a physical condition," and he was not referred for additional mental health treatment. (Tr. 162.) The plaintiff supports his argument by focusing on Dr. Ngo's initial findings, but he does not reference Dr. Ngo's March 31, 2004, report. *See* Docket Entry No. 16, at 1-2.

On June 10, 2004, nearly two months after Dr. Ngo issued his second report, Dr. Linda Blazina, a consultative psychologist, examined the plaintiff and opined that the plaintiff's mental impairments did not significantly limit his ability to function. (Tr. 169-70.) The plaintiff also revealed that although he felt depressed or anxious in the past, he had no current feelings of anxiety or depression. *Id.* Given that neither Dr. Ngo's nor Dr. Blazina's medical evaluations indicate that the plaintiff suffered from significant mental impairments (Tr. 162-71), the ALJ did not err in his assessment of the plaintiff's mental limitations and, contrary to the plaintiff's assertion, the ALJ's findings did not "fl[y] in the face of" Dr. Ngo's medical opinions. Docket Entry No. 16, at 2.

### 2. The ALJ properly evaluated the plaintiffs physical RFC in determining that he could perform medium work.

The plaintiff also faults the ALJ for finding him capable of performing medium work when both a consultative and treating physician determined the plaintiff could only perform "less than sedentary work." Docket Entry No. 16, at 1-2. The consultative and treating physicians to whom the plaintiff refers are Dr. Cox and Dr. Sewell, both of whom prescribed physical limitations that limited the plaintiff to sedentary work. (Tr. 14, 175, 273-75.) However, the ALJ afforded significant weight to the findings of DDS physician Dr. Fletcher (Tr. 190-95), whose physical limitations allow the plaintiff to perform medium work. Although Dr. Sewell is a treating physician, the ALJ correctly afforded minimal weight to the physical limitations that he assigned the plaintiff. Thus, the divergent limitations assigned by Dr. Cox and Dr. Fletcher are the sole issue.

On June 23, 2004, Dr. Cox conducted a physical examination of the plaintiff and found that he "appeared to be in no acute medical distress;" could walk across the examination room and climb up onto the examination table "without difficulty;" and "[h]is ability to hear, speak, and communicate" was not impaired. (Tr. 173.) Dr. Cox also gave the plaintiff a neurological exam and found that the strength in his four extremities "was intact," that he could stand on his toes and heels, that he could balance himself on either foot, and that the range of motion in all joints "was

22

unremarkable." *Id.* Yet even with these largely unremarkable findings, Dr. Cox concluded that in an eight hour workday the plaintiff could lift up to ten pounds occasionally and five pounds frequently, sit eight hours with a break period about every hour, and stand four hours. (Tr. 175.) Dr. Cox opined that the plaintiff could "get up and move around every three minutes or so," and that "[h]e should avoid squatting, bending, kneeling, stooping and climbing for more than a total of four hours in an eight-hour workday altogether." *Id.* Although the ALJ may have overstated his criticism of Dr. Cox's reliance "almost entirely on the claimant's subjective complaints," the ALJ was correct in asserting that the record, including Dr. Cox's own medical findings, did not support the physical limitations Dr. Cox assigned to the plaintiff.

The ALJ properly afforded Dr. Fletcher's physical RFC controlling weight. Since the treating physician's opinion was not given controlling weight by the ALJ, the regulations require the ALJ to explain the weight given to the State agency physician. *See* 20 C.F.R. § 404.1527(f)(2)(ii) ("Unless the treating source's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician or psychologist . . . ."); SSR 96-6p, 1996 WL 374180, at *1 (ALJ cannot ignore the findings of fact by State agency medical and psychological consultants and must explain the weight given to such opinions in their decisions). The ALJ also complied with 20 C.F.R. § 404.1527(d)(3)-(4) by focusing on the factors of consistency and supportability in assessing Dr. Fletcher's opinion. The ALJ stated that "[t]he claimant's physical capacity limitations are consistent with the June 2004 [sic] State Agency physician's medical source statement . . . ."[20] (Tr. 14.) Dr. Fletcher clearly explained the findings of her physical RFC and listed the medical opinions of other examining sources as support for those findings. (Tr. 194.) Dr. Fletcher even noted that Dr. Cox's assigned limitations were "too restrictive" considering the unremarkable results

---

[20] The ALJ dated the state agency's physician's RFC, labeled exhibit 7F, as June of 2004, but it was really dated July of 2004. (Tr. 195.)

of the neurological exam he gave the plaintiff. *Id.* Furthermore, the physical limitations Dr. Fletcher assigned the plaintiff were consistent with the plaintiff's activities of daily living. (Tr. 168, 204.) Given that the opinion of the plaintiff's treating physician, Dr. Sewell, was not assigned controlling weight, that Dr. Cox's prescribed limitations were not supported by his own findings, and that Dr. Fletcher arrived at her limitations by examining the medical evidence of other examining sources, the ALJ did not err in affording controlling weight to Dr. Fletcher's physical RFC.

### 3. VE's testimony supports the ALJ's finding that the plaintiff could perform his past relevant work.

The plaintiff argues that the VE's testimony does not support the ALJ's finding that the plaintiff could perform his past relevant work because a hypothetical question posed by the ALJ included both medium and heavy exertional work. Docket Entry No. 16, at 4. The VE separately classified a concrete mixing truck driver as "medium work, semi-skilled" and a material handler as "heavy work, semi-skilled." (Tr. 44.) In a hypothetical question, the ALJ then asked the VE to consider whether the plaintiff could perform his past relevant work if he were "limited to medium exertion" and had various mental and physical limitations. (Tr. 44-45.) The VE testified that the plaintiff could perform his past job as a concrete mixing truck driver. (Tr. 45.)

The plaintiff's assertion that the ALJ's hypothetical was "based upon medium to heavy work" is incorrect. The ALJ used the classification of medium to heavy work to describe the plaintiff's past work experience. (Tr. 44.) The ALJ clearly indicated in his hypothetical question that the VE was to consider an individual "limited to medium exertion." *Id.*

The plaintiff also alleges that he could not return to his past work since the unloading or material handler portion of his job is classified as "heavy work, semi-skilled." Docket Entry No. 16, at 4. Yet, in following the Dictionary of Occupational Titles ("DOT"), the ALJ separated the plaintiff's past work into two different jobs: concrete mixing truck driver and material handler. *See* U.S. Dep't of Labor, Dictionary of Occupational Titles 917, 949-50 (4th ed. 1991). The DOT

considers the job of a concrete mixing truck driver to be a position independent of a material handler, thus the level of strength an individual exerts for each occupation should be considered separately from the other. *See id.* Further, the disability regulations state that

> a vocational expert or specialist may offer expert opinion testimony in response to a hypothetical question about whether a person with the physical and mental limitations imposed by the claimant's medical impairment(s) can meet the demands of the claimant's previous work, *either as the claimant actually performed it or as generally performed in the national economy*.

20 C.F.R. § 404.1560(b)(2) (emphasis added). Even though in the plaintiff's past relevant job he performed duties of both a concrete mixing truck driver and material handler, those jobs, as generally performed, are independent of each other. In light of the VE's testimony, the DOT, and 20 C.F.R. § 404.1560(b)(2), the ALJ properly concluded that the plaintiff could perform his past work as a concrete mixing truck driver.

## V.  RECOMMENDATION

For the above stated reasons, it is recommended that the plaintiff's motion for judgment on the record (Docket Entry No. 16) be DENIED and that the Commissioner's decision be affirmed.

Any objections to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of service of this Report and Recommendation, and must state with particularity the specific portions of this Report and Recommendation to which the objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed. 2d 435 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully Submitted,

JULIET GRIFFIN
United States Magistrate Judge